is to be submitted today on oral argument. Mock v. Garland. Mr. Jaffe. Mr. Presiding Judge, and may it please the Court, Eric Jaffe for appellants. The District Court, in denying the preliminary injunction in this case, was incorrect in concluding that we had not established a likelihood of success on the merits. In fact, it was incorrect because he applied the wrong legal standard in two particular instances and in greater detail as we go on. The first one is in the Second Amendment context where the judge held that the lack of substantial historical evidence should be held against plaintiffs rather than against the government, which reverses the burden of proof set forth in Bruin. Under Can we rectify that? Can we look at amici or otherwise ourselves and establish? Or would you say his finding of that is conclusive, the government doesn't get a second bite in front of us? Well, I mean, I imagine that you could remand it while still at least under a temporary injunction and the Court could ask for more evidence. But as a practical matter, that gives us the preliminary injunction, at least until further briefing makes the take the evidence of what the historical record was based on a few amicus briefs. That's not enough. There's obviously been an expedited briefing. So if you decided, oh, there's a lot of statutes the government cites, we've only had very limited ability to rebut those as to why they don't actually meet the Bruin standard. So what I would say is if you thought that I would keep the temporary injunction in place, at least until the District Court had a chance to further take further briefing on the issue. Are you starting with the Second Amendment? Is it because you're stronger likely to success? Are you just, you're picking it? Or let me just, a third point, is it because if you show likelihood of success on that, then you've established irreparable harm, which the District Court here has never reached? It has all those benefits, but I start with it only because it is clean. It is remarkably clean and simple to rule on. The notion that a braced pistol is not a bearable arm is not plausible. That's not even a facially credible. That's the attachment argument. Well, no, when it's attached to the pistol. The attachment standing alone is a paperweight, as far as I can tell. It solely matters if it attaches to a pistol. We're talking about using these to stabilize a pistol. So sure, you want to sell it as a paperweight, as a historical paperweight that can't be attached to anything? That's not meaningful. Do you understand the government to be arguing primarily from Heller and Bruin that these are dangerous and unusual weapons, in as much as even worse than, say, a shot-off shotgun? This thing is concealable because it's actually much more lethally accurate. So it's the most dangerous and unusual outside Second Amendment? Or do you understand them to be saying, no, there's a history and tradition of inspections alone, and this is just a registration inspection one, and we've given you the history of that? I understand them to say both things. I think both things are incorrect. So on the dangerous and unusual, of course, it's a conjunctive test, not a disjunctive test, and they're obviously quite usual. There's three million of these out there, and if you wanted to add in actual short-barreled shotguns with actual stocks, that would be, you know, three and change million. There's an extra several hundred thousand of those, which is well above what was in Caetano, and certainly is far above anything in Hollis that we might have ruled upon, vis-a-vis machine guns. So they're clearly common use by lawful citizens. They give a smattering, a tiny smattering of crime committed with these, which is nowhere in the ballpark of the crimes committed with handguns standing alone. So you can't possibly claim that they're somehow not usual and usually owned by lawful citizens. So that's the first part. Do you understand the dangerous and unusual test to be looking at 1791, or looking at today, or some little blur of both? I understand it to be looking... The concept of it starts in 1791, but it obviously translates forward, much like we translate forward those concepts to modern weapons. I mean, Heller and Broom both said that, and I think, obviously, the concept of dangerous and unusual would translate forward. No one imagines that... Are silencers dangerous and unusual? I don't know whether it's dangerous and unusual. I haven't done the research on how many silencers are out there, whether a silencer is really a pistol break. There's a lot of questions there. But on this, let me just say, it's clearly usual, which is enough. But even on danger, the danger argument is not plausible, because they can see that I can take the brace off and have the exact same AR pistol, which is the same ammo, the same gun, the same everything else, the same magazine, the same lethality. The only thing that's there is that it's not stable, which means I can't control it as well. If anything, that pistol without a break... You're not arguing that if it's a pistol with a stock, it's not dangerous. You're acknowledging that, right? If it's a stock, hence, it really is a rifle. Well, we have said that we think even the short-barreled rifle ban is arguably against the Second Amendment, but we did not reach that. That was in the alternative. We certainly made that argument. There's no credible historical evidence on why carbines, which are basically short rifles, are historically permitted to be banned and why they're any more dangerous than anything else. What I would say, though, about this... But before you get off that, that's why I'm very confused by the argument here, because unless you do argue that the stock itself, so the whole framework of the NFA, Congress's determination that a short-barreled rifle is inconsistent with Bruin, isn't ATF, by this final rule, just saying, show us your braces? Because under Part 1 of the rule, if it doesn't have a rear surface area that pushes into the shoulder, you don't even look at the six criteria. You get to keep it. I don't have a problem with them saying, show us your braces. What I have a problem with is the criteria they use to evaluate whether those are intended. My point is, they don't get to their criteria if it doesn't have the shoulder surface area. That's Part 1. There's nothing discretionary without that. Their view of what constitutes surface area is a little broad in our view. It would include a lot of things. We've given examples of specific models that they've previously said were fine and now say are not fine, so that we understand that at least at a minimum, it is ambiguous what counts as adequate surface area, because that was not what they held before. So just their change in position. I've asked you a lot. Yes, you did. But jump to that second point, just so I don't forget my own line of thinking, which is, it does seem to me the government is saying, put aside dangerous and unusual. There's a clear early colonial history of just inspecting these things for safety, and that looks like it bleeds into footnote 9. So two things. One is, the NFA does far more than merely inspect them for safety. It puts a lot of restrictions on them, fully apart from whether they're going to blow up in your hands. Second of all, that early colonial history was not designed to take away the guns. Actually, most of those inspections were more designed to see what else we need for a militia. Do we have adequate guns available? If anything, the rules in some of these states would have been, buy more guns, not take away your guns. So I don't think those are adequately analogous or universally consistent to justify the far more onerous burdens imposed by the NFA. So that's just a brewing problem about whether the history is analogous. But I want to get back to something you had asked me before that was sort of in that string of questions on danger. No, but stick with me. When you say to take away guns, is I see the attack in this case, but not in other parallel attacks. The attack here is as to classifying the gun. It's not as to, is this person someone who we can allow to have the gun? And therefore, I don't see this as a take away a gun, at least arguably. This is, you know, show us the thing. If it's a short-barreled rifle, you can keep bearing it. You just have to pay a tax and register it. Well, that's not actually the way the rules work. The rules are more like brew in May issue. ATF is asserted the authority to deny the ability to bear an NFA weapon completely in its discretion. But that's as to whether the person is deserving of it has nothing to do with the six criteria. I don't wrong. Oh, the six criteria trigger the May issue. It's like saying a pistol license is a May issue license. So the fact that the pistol triggers the May issue, but the May issue is the burden placed upon. The other thing I would say is they're not just categorizing it to give it a fancy name. Obviously, the categorization has consequences, and it is the consequences of that categorization that constitute the burden on Second Amendment rights. So yes, if they were just going to look at it and say, oh, that's blue, that's red, that's pink, I'm going to call that one George. Great. But that's meaningless. That's not what the NFA does. The NFA actually has real-world practical consequences on the owners of weapons so categorized. But one thing I want to get back to on dangerous and unusual. On the danger part, the concealability is almost laughably backwards because the same pistol without the brace is far more concealable than when you attach the brace on it, making it bigger and more awkward. The brace adds stability. I will give you that. But stability does not make it more dangerous, any more than a new modern rifle that has better features for aiming and control is more dangerous. Yes, if the wrong person uses it, I suppose they could use it more effectively. But you're not disputing that the NFA constitutionally can require possessors of shot-off shotguns to register and pay the tax? I think shot-off shotguns are different. I think that they have a different mechanic. They're less dangerous because they're inaccurate. This is a highly accurate rifle, thus the sniper in Boulder and a sniper in Dayton. They've got this thing that can come apart, then they can reassemble it, and then from a tower or wherever they can hit people. And this is actually less accurate than a long-barreled rifle, which would be much better, have more rifling. So if that's the question on super-duper accuracy of snipers, the answer is long-barreled rifles are far more dangerous than brace rifles. If we're accepting that the NFA constitutionally can apply... I'm not accepting that. I'm just saying I haven't reached that. You're not accepting that Bruin allows them to require possessors of shot-off shotguns? I'm saying it's not an issue in this case. I'm asking you to compare the two. Well, I think there are differences. I'm not going to say whether those differences would lead to different results because that's not the case before me and I've not been asked to defend those. So you can assume that arguendo. That's fine. I don't have a problem with assuming an arguendo. And what I would say is the difference is a shot-off shotgun is wildly inaccurate and has a lot of risk of collateral damage, whereas a more stable, more accurate pistol means you hit what you're aiming at and therefore don't kill the kid in the stroller, you don't go through the window. If you're shooting at an intruder in your house, you don't make a mistake. The notion that a more accurate and more controllable firearm can be banned precisely because it's a better firearm gets it exactly backwards. Is there any post-Bruin footnote 9 circuit or district court opinion that you would point me to? On that particular point? Just on generally, how do we understand when it's a legitimate shall issue regime, which I think NFA closely resembles, or no, it's not because they ultimately still have discretion to deny people for any reason? I don't know that there's any decision that deals with the shall versus ban of the NFA. What I do know is the government has asserted, and I guess we should discuss them, they have not denied that they claim discretion to deny for any reason whatsoever. So whatever the reasons are, whatever is going through their heads, I don't know, but it's not written down and it's not regulated. Can the regime confine our Bruin argument analysis at all, or we confine it all? I think regime confirms our approach to these things. I don't think it confines it. I think it tells you exactly why the court got it wrong. It got the burdens backwards that if you want to not merely name these things and put them on a list, but make that list have legal consequences, which is I can't sell it, I can't buy it, I have to lock it away. My spouse or other resident family member has to also be NFA licensed if they're going to even be in my house. I can't transport it across state lines if I have a country house, you know, in Texas than here. All those things are real meaningful burdens, just as bad as the carry versus not carry burdens in Bruin. In fact, worse than those. Has any NFA provision yet been struck by any court under Bruin? I don't know the answer. We would be the first. Well, I'm not asking you to strike the NFA provision. What I'm asking you to do is strike the regulation that applies to Pitfall. It may have the implication that in a future case, the logic of your reasoning could apply to the NFA, but I'll let that case happen when it happens. Strike, okay. But the rule doesn't have anything to do with the discretionary part of NFA denials. The rule has to do with, assuming there's a rear surface area, we use these criteria to assess if it's what Congress told us to register, rifle. Well, remember, our first argument is that these are pistols, not rifles, and that their criteria for redefining a pistol as a rifle is wildly vague and imprecise and indeterminate. So there's that. When you say wildly vague and imprecise, the rule itself heavily relies on the First Circuit's Sig Sauer case. The government heavily relies on it. You didn't cite it at all. Why isn't Sig Sauer and David Barron's opinion in the First Circuit conclusive as to these are well-defined terms? Ordinary people understand length, weight, how manufacturers manufacture it, what the use is, every criteria. The criteria that I'm challenging are the things that say indirect marketing, the behavior of people other than you that you may or may not know about, and the word similar. Does it have a similar weight? I understand what weight means. I don't understand what they think is similar or comparable. I don't think that there's any definition there other than sheer procedural discretion. I don't like that one. Your vaguest argument is it's the criteria five and six. I think the last three criteria. I don't remember what numbers they were off the top of my head, but it was the similar weight, similar length of pull, indirect marketing. Those are the Sig Sauer factors, but the two that may not be are how is it used out there, and number two, how do the manufacturers market it? I would be willing to concede to you that if a manufacturer stood up and said, hi, this is a shoulder launch thing, but I'm putting a strap on it just to say it's not, yeah, of course I can take that into account, vis-a-vis the manufacturer. I'm not sure I can take that into account, by the way, vis-a-vis some purchaser who may or may not have heard that statement, but vis-a-vis the manufacturer, if they sort of admit, ah, yeah, this is a rifle, it's a sharp-edged rifle, but I'm going to call it something else, but let me tell you, even there, by the way, in Thompson Center— What's your best vagueness case, and then I think we're getting close to the APA claims. Don't worry. I think Judge Smith has indicated, especially because I'm consuming a lot of your time, you're going to get more time. I think my best vagueness case is Carville. This is almost on all fours with their attempt to expand the definition of machine gun in terms of is it vague or is it not vague. If we're asking, is there ambiguity in the definitions such that we need to have a rule of lenity— That was going to be fired automatically, single pull of the trigger. Here it's, does the item go on the shoulder or not? And did their indirect marketing, whatever that was, suggest that it was intended to do that and designed to do that? So the example we give in our brief of a pistol brace, the patent that we show you, the notion that that was intended to be from the shoulder, when it has this hole in the middle that you're supposed to put your arm through, I think on its face is implausible. And so if all of a sudden these other vague factors can override what the obvious design features are, that's a meaningful problem, whether it's lenity, whether it's void for vagueness, whether it's statutory delegation, it doesn't matter. All of those causes of action are functions of ambiguity and vagueness. And APA comes last. Well, they're all part of the APA, right? Because remember, I'm interpreting the statute under the APA. What's your primary APA infirmity here? That the statute properly construed, narrowly construed, does not allow for the rule. That's the APA. I'm sorry. So it's legislative, not interpretive, is what you're saying, right? Yes. What I'm saying is it's constructive. I think, you know, old law school things, I think of interpretation versus construction. This sort of falls into the construction and legislative is what we call it now. But when there's ambiguity that needs gap filling, you need to construct the bridge in that gap. Interpretation says, what does weight mean? And I say, weight means mass. Or no, weight means, you know, weight, depending whether you're on the moon or here. That's interpretive, figuring out which one they meant. But when the interpretation is, do what you want. What if the statute said, do whatever you want, stop bad guns? That's gap filling. I know what bad means. Bad means bad. You don't like it. But it leaves so much room for freewheeling decision making that that becomes constructive, not interpretive. Does the rule impose any legal obligation that's not already in the statute? Well, I believe it does. So anyone who got a prior ruling letter on whether or not the thing they manufactured was a proper brace or an improper stock attached to a pistol, they could rely on that in terms of if they ever were prosecuted. They revoked all of those. So it plainly changes the legal consequences of the existing rules. It also, by the way, just changes the Code of Federal Regulations. I find the whole argument that this is merely precatory, it's just us spitting into the wind and letting you know what we think, we're just spitballing about what's going through our heads, to be bizarre at best. I mean, that was the case in Cargill, by the way. The government made the same argument that this was merely interpretive. And yet that didn't stop anyone from reviewing it and deciding. But it had real legal consequences, at a minimum, because what it did was threaten people who were previously obeying the law with prosecution. If you convince us that it's constructive, substantive, legislative, you've still got to show that it's not a logical outgrowth. That's for one of the several ones. I think I get my lenity stuff coming. OK, I know. But go with me a little bit, because in your brief, you do accept Yes, of course. our 2021 Huawei decision. And as I read that and the Supreme Court's Long Island decision, the question is just by framing a subject, could you have anticipated the final rule? Well, what I would say is our main argument is, look, the first, the NPRM had a point system that was discrete and concrete. And you can just add up the points and have an answer. And they said that was important. It wasn't merely happenstance. It was very important to have a concrete answer to give the uniformity they claim to want. And when you literally rip the heart of the importance out of it and say, well, instead of having a concrete rule with a point system, we're just going to have those factors, however we see fit to apply them. Maybe this one weighs. Maybe this doesn't. Maybe one's enough. Maybe four's enough. Nobody knows. That is such a dramatic change, even if all the factors were the same. The notion that you went from a concrete rule that's predictable, and by the way, fits with things like lenity and people being able to conform their behavior, to something that didn't. I mean, a minimum one of the comments would have been, are you kidding me? How can a law-abiding citizen know whether or not they're violating the law? At least with a point system, I could add it up. Under Huawei, we look at the comments, and I think it was you filed on behalf of the plaintiff coalition. The whole thing was about way too discretionary, way too on top. And then you have a lot of comments saying the worksheet is wrong. So just since you're focusing on that, let me read one. I'm opposed to the proposed rule. This rule proposes a somewhat hard to follow point system, where if the gun scores four points or more, it would automatically be considered an SBR. So the comments fully, everyone was aware of discretion, too much discretion, worksheet good, worksheet bad. So you get a final rule that says we're going to remove that thing that people oppose. Well, but I think the comments sort of said, look, you have something that tries to be concrete, and you just didn't quite get there. So we'd like you to get there more clearly. And so the response to that to be, you know what, we're just going to throw out all clarity and make it a grab bag of things that we can decide whenever we want. That is not a logical outgrowth, even of the comments. We would have had far more comments and said, not only is it difficult to follow, but now you're getting into wildly unconstitutional territory. What's your best circuit case about this is wildly dissimilar. We couldn't have anticipated it. Hence, it fails the logical outgrowth test. What case would you point us to? I don't know that there's one about whether you could have anticipated it at all, though I'll have to get that for you. I don't know off the top of my head, which the best case of that is. I apologize. If there's no further questions, I see my time. You still say you're full time for rebuttal. Thank you, Your Honor. Mr. Bosch. And you have your full 10 minutes, Mr. Zemeckis. Thank you, Your Honor. Ryan Bosch on behalf of the state of Texas is amicus supporting the appellants here. I'd like to focus on two more reasons that underscore why you should rule for the statutory argument specifically. And if I have a moment, I'd like to address the proper remedy. So as to the statutory argument, first, the rule of lenity and basic guarantees of fair notice command a ruling for the appellants. And second, you should also rule for them as a matter of constitutional avoidance, because if the brace rule is upheld, as within their statutory authority, it's going to create multiple severe constitutional problems. You already heard about the Second Amendment, and I'd like to talk about the taxing power here. So starting with lenity, this statutory interpretation doctrine exists to ensure that persons are on fair notice of what is criminally prescribed, and for at least three reasons that fair notice is lacking here. The first reason is that ATF has repeatedly provided assurances to gun and brace owners over the past decade that the addition of a stabilizing brace does not render a pistol a short-barreled rifle. They said, and this is word, that even if the owner, quote, unquote, uses the brace improperly for shoulder firing, it does not become a short-barreled rifle. They also recognize that a stabilizing brace is not designed to be shouldered. Again, that's their language. Is your argument right now grievous ambiguity? Is your argument sort of a stop or reliable interest? This is a vote face. What are you arguing now, that this fits under grievous ambiguity? And if so, what terms? Well, we certainly believe that the ATF's previous representations about the statute, about stabilizing braces, create the kind of grievous ambiguity that is necessary to trigger the rule of lenity. But more fundamentally, the rule of lenity is about fair notice. And no one who owns stabilizing braces, according to ATF, it's over three million people before they promulgated their final rule. None of those people could have plausibly been on fair notice that those stabilizing braces, if connected to a pistol, would create a short-barreled rifle. And now ATF is telling those people, you don't register, you're a criminal. I assume you agree, though, that in cargo, we basically said that the rule of lenity is kind of the last refuge. In other words, we have to, quote, avail ourselves of all traditional tools of statutory construction before we reach, before the rule of lenity might apply. That's right, Your Honor. And we think that the Thompson Center case illustrates how, even if you do employ all the rules of traditional construction, that you are left with an ambiguity here. Because the Thompson Center case, of course, as we've described in our briefing, illustrates pretty clearly that if you've got a combination of parts that can be used to create a short-barreled rifle but also could be used to create something else, then as a matter of statutory interpretation, applying the rule of lenity, you do not have a short-barreled rifle subject to regulation under the NFA. I don't know how ATF gets away from this problem. Their briefing doesn't address Thompson Center in any material respect. And I think Congress has said it is a short-barreled rifle. I mean, I guess what I'm thinking, and I think Texas law ties in. In other words, you probably, presumably, are defending your laws. Possession of a short-barreled rifle implicates the NFA, implicates Texas state law. What's the grievous ambiguity? It's the interpretive criteria? Well, Texas law just cross-references the NFA, right? And it says that if you haven't registered something according to the NFA's terms, then you've got a problem. Well, imagine you're defending Texas's law. You'd say the earlier refusal to give any clarity somehow adds, reduces the ambiguity, then this perhaps defective effort to say, here are the six primary points of focus. Well, two responses, Your Honor. Our first point is that because Texas law cross-references the NFA, we have a serious interest in making sure that the NFA is properly interpreted. And they've gone well outside the bounds of how they can interpret the NFA here, and that creates a problem for Texas. No, but if you win, it reverts back to what? They just decide as they always have been, case by case? How is that clear? Not at all, Your Honor, to the extent that they've been deciding case by case. And I think if you look closely at their letters, there is frequently unequivocal language in those letters. It's not just limited to, oh, you just brought one stabilizing brace to our attention for one guy. No, no, no. Their letters are frequently more unequivocal than that, just talking about stabilizing braces in the abstract. But to the extent they've been talking out of both sides of their mouth in the past, and granted, they have been, that cuts against them under the rule of vanity. It can't possibly be the case that— They aren't making an arbitrary and capricious argument. Well, I think this goes to statutory interpretation, Your Honor. I think this is a significant factor in the Cargill case, the fact that the agency didn't speak— Cargill is 922-0. I mean, that's a felony offense to have a machine gun. Here, it's a registration scheme, and Texas itself presumably has been applying its own laws to persons who do have short-barreled rifles. And so what I'm confused about, I think you'd understand, is as far as I see it, this initiative is just, here are some criteria. They limit us somewhat compared to what it was. But is Texas's goal here to get back to black box? Let me talk about their criteria, if I may, for a moment, Your Honor, which is their criteria really creates much greater problems than existed previously. And the reason for that is because the only one of those criteria that appears to be mandatory before they conclude a weapon is a short-barreled rifle is the first one. And the first criteria, as we've discussed in our briefing, just says that the brace allows for a holder to shoulder right — shoulder fire the — I'm sorry, shoulder fire the rifle, right? Well, mechanically, it's got a rear surface area. It's like a stock. Right. Right. That's — well, I wouldn't say it's like a stock, Your Honor, but I would say that the first component of their rule says that this brace will allow for shoulder firing. And that does not come within the terms of the NFA. That is clearly not enough. Just allows. Thompson Center conclusively rebuts the possibility that something that allows for shoulder firing is a short-barreled rifle. Then you get to their other six factors. And they don't tell you that any of those other six factors count for anything. Right? It's not clear under the terms of their rule why, if they find the first factor is not satisfied, they might just say, well, now you've got a short-barreled rifle. We didn't say we were going to give any weight to the other six factors. And to the extent we said we were going to give weight to any of them, well, we're just going to pick this one factor that's satisfied here. That's enough. This weapon is a short-barreled rifle. Ordinary citizens, under pain of criminal penalty, cannot possibly be expected to abide by that kind of regime. If I may, Your Honors, I'd also like to say a word about the taxing argument, because I think that this also creates a very straightforward way to resolve this case. Did the parties preserve that or assert it here? Well, I think as a matter of statutory interpretation, Your Honors, have to avoid creating constitutional problems. And the footnote two of our amicus brief goes into this in a little bit of length. Of course, also, the Supreme Court has recognized that it's really a matter of discretion whether you're going to consider amicus arguments. And I'd point Your Honors to Teague. Go ahead. Make your argument. Certainly. Thank you, Your Honor. As our brief lays out at some length, ATF has repeatedly taken the position that it has unlimited discretion to approve or deny registrations. And I think that has to form the backdrop for how you view the brace rule. This is something that they've stated as a categorical matter. And in fact, they've stated as recently as 2022, while this rule was in the hopper, while they were finalizing this rule, they represented this to a district court, I believe it was the District of Idaho, in the Clark case. And I'll just quote them here. According to them, quote, unquote, the NFA gives ATF complete discretion to approve or deny an application to make an NFA firearm. Now, that can't—sorry, Your Honor. No, I really like that your brief brought this up, because it's a difficult one for me. But I don't see it—as in your brief, you point out, it's coming up in parallel litigation. I don't see that they're presenting it to us here, which is to say there does appear to be discretion in terms of who gets registered. But that isn't discretion that we're focused on the final rule, which is how do we classify the gun? In other words, I'm asking, right? The gun classification is what I thought we are focused on here. The discretion, the unfettered discretion may or may not exist, as you point out other cases are raising, as to them being able to say, not you, even if yours is a social villain. Sure, Your Honor. I don't know how you can separate the two, right? Their interpretation of the statute is that they have complete discretion to approve or deny registrations. I think it has to form the backdrop for how you're doing the brace rule, especially because the brace rule applies retroactively. It applies to people who already possess these things. And because the brace rule waives the registration fee for the first 120 days for all those people who already own braces. There's no plausible way to say that that's an exercise of taxing power. It's purely regulatory, right? And the NFA was passed as an exercise of Congress's taxing power. All of ATS regulations, I think, have to be implementations of the NFA, have to be keyed to the taxing power. There's just no plausible way to say that applying the brace rule retroactively, waiving the tax, subjecting people to this pure form of regulation, and then punishment if they don't comply, is constitutional. There's no way to square it with taxing clause precedent. And of course, the defendants haven't submitted it to Congress clause regulation. I'm very eager to hear what your thoughts are on Remy. And particularly because you were the plaintiff in the case we heard and decided just a few weeks ago. Is it Missouri versus Biden? In terms of our court saying there, if the district court hasn't already done in the first instance, balancing of equities, irreparable harm, they get a first shot at it. Well, I certainly, I think that's one way to approach this case, Your Honor. But I'd also note that the court here has already entered an injunction. We think that injunction should continue as long as this case is being litigated. And I ask for the scope of that injunction, which is what I'd really like to address. I see I'm running out of time. You can take whatever time you reasonably need. Thank you, Your Honor. I think that it's clear that a nationwide injunction is proper here. I think that's true under the Feds for Medical Freedom case. And I think that the circumstances here are actually even worse than what you had in Feds for Medical Freedom. Or rather, another way of putting it is to say it's more warranted here than it was in Feds for Medical Freedom. That would be going beyond what you just said is our current appellate injunction is, as we slightly expanded it from the motions panel, right? And so you're asking us now to expand it yet again to the entire nation. But as you point out in your brief, there are three other circuits considering this issue. So how would we just, as a matter of comedy, are you suggesting we should impose one? Or why not keep it exactly at the level that our Court's already done beyond what Judge O'Connor was considering? Certainly, I take Your Honor's point, and I recognize that the fact that other circuits are considering this question raises some complex issues. At a bare minimum in that case, I think you should expand the injunction to cover the Fifth Circuit. Or, you know, we'd be satisfied if you covered the state of Texas at a bare minimum. And this, of course, Louisiana v. Becerra opinion, I think, stands pretty strongly for the idea that the Court can do that, right? In Louisiana v. Becerra, this Court modified a district court's nationwide injunction to apply more narrowly. I think comedy concerns motivated that narrowing. And to the extent you're concerned about comedy here, I say the Fifth Circuit, at a bare minimum, Texas, this rule cannot constitutionally be applied in the state of Texas. Would the plaintiffs in this case get anything more from a nationwide injunction? Or are they fully covered? Well, it depends on how ETS decides to apply the rule while the injunction is in place, right? And I think that illustrates why a broader injunction is proper here. How are they going to apply this rule while an injunction is in place? Are they going to, you know, demand that persons prove their membership before ATF initiates an enforcement action? Are they going to ask these organizations for a membership list? Isn't that a really pretty compelling argument to say Reed O'Connor ought to look into this? Of course he has to name who it is ATF can't apply it to. We don't know about it. Well, our point is that in the interim, while this case is being fully this is a highly inequitable and chaotic way to apply the brace rule to ask people to prove whether they're parts of these membership organizations or to demand from demand membership lists from the organizations. Procedurally, to me, there are two different concepts here about the remedy. One is that there can be a stay pending appeal. That means they stay in place while we decide this appeal. But I think you're going beyond that and saying we would decide this appeal on whatever issues we think are before us and then it would be back in the district court but somehow our stay would remain in effect. But that's not a stay pending appeal. That's some kind of a permanent injunction or a permanent stay or whatever we might want to call it. It seems to me that the difference is important. Explain which one you're asking for and why. It seems to me a little bit strange if it's back in the district court that there's still this stay from a higher court because the appeal essentially has been decided. Certainly, Your Honor. We do recognize that a stay pending appeal situation might be different. Of course, this court entered an injunction pending appeal. I recognize that the two are highly similar concepts. But I think that the Louisiana versus Becerra opinion establishes that this court can modify injunctions and send the case back to district court. Just as a matter of basic equity, I don't think that there's some kind of hard line constraint on what the court can do here. And we submit that as a matter of basic equitable principles. There's no way that ATF can be enforcing this thing while it's enjoined as to some people and not as to others. Do you have a thought on this sort of quick exchange I was having about any best authority? This isn't a logical outgrowth from the proposed rule in light of the 270,000 comments that said this is already too ad hoc, this is too discretionary. How would it possibly fit into that line of authority that the final rule here isn't it a logical outgrowth if essentially what they did was take out the worksheet? Yeah, I apologize, Your Honor. Texas has not presented the logical outgrowth argument. You haven't presented it? Okay. I haven't presented it here. Thank you, Your Honors. Thank you, Mr. Bosch. Mr. Janda? As with the other presenters, you'll have whatever time you need to present your case. That does not mean you should feel obliged even to take the full 30 minutes if you don't wish to. That's up to you. But don't feel constrained because we've given everyone else some extra time. Thank you, Your Honor. And may it please the Court. Sean Janda for the Federal Government. I think it might be helpful to start this morning by just being very clear about the circumstances that led to the rule and about what the rule does and doesn't do. So as the rule makes clear, for years leading up to the rule, individuals or entities that wanted to manufacture or sell or possess short-barreled rifles without complying with the NFA's requirements would take an item labeled a stabilizing brace but that was functionally identical to a shoulder stock, stick it on the back of a heavy pistol, and use the resulting combination as a short-barreled rifle. And the rule catalogs extensive, extensive evidence that this is how many stabilizing braces were, in fact, being marketed and used by the regulated community. And I think sort of in addition to that circumvention, there was substantial confusion among the regulated public because ATF had issued classification letters to different brace designs, some saying that they were not short-barreled rifles, some saying that they were short-barreled rifles, without a particularly clear, consistent framework for evaluating the intent question. And so in the face of that circumvention and that confusion, ATF decided to issue the rule. And the rule primarily does two things. So first it says... Well, it promulgated a proposed rule, got almost 300,000 comments, and then two years later it comes out the final rule. So would you agree that this is a rule, that it is a substantive rule, or are you going to really stand on the hill that this is an interpretive rule? So we certainly think it's an interpretive rule. I mean, I think you can go right to the first paragraph of the rule, which says this rule is doing nothing more than trying to clarify ATF's best understanding of the NFA's intent requirement. But the rule itself says this is going to cost millions and it's going to be close to 3 million Americans with guns or these attachments that will be affected. So that sounds immensely consequential as to legal rights. And I think rules, even interpretive rules... What's your best case that this is an interpretive rule? I think FTI, which we cite in our briefs, is a relatively recent Fifth Circuit case. FTI. FTI v. FAA. And what that makes clear is that interpretive rules can be sort of substantive in some sense, can have real consequences, especially to the extent that the underlying statute that they are interpreting has real consequences. And so here the rule, I mean, over and over again, I think makes clear that ATF is just trying to articulate for the public its requirement ought to be applied. If it's interpretive, that means that this has always been the case that the rule really didn't change anything, which means that all of these thousands, tens of thousands, however many people who have these have always been in violation and are subject to criminal and other penalties, right? Yes. So the rule makes clear ATF's view that these things, to the extent that they are, in fact, designed to be intended to be fired from the shoulder, have always been short-barreled rifles under the NFA. There was no explanation or rule that was really needed, right? Because it was always obvious, in your view, to anyone that he or she was in violation. So I'm saying it depends on the particular brace pistol combination. And we have some pictures in our brief. There are a lot of pictures in the rule of people who I think were quite clearly aware that the thing that they were using was a short-barreled rifle that looked and functioned identically to things marked as a short-barreled rifle. There are videos online. There are things in marketing materials, in trade publications, saying quite explicitly, if you want to have a thing that you can use as a short-barreled rifle but that's not subject to the NFA because ATF has been unclear, you can buy these products. And so I think there probably was some intentional circumvention. I think ATF makes clear in the rule that it created some of that confusion itself by not having— through notice and comment at all. I think ATF understands that this is an issue that is of importance to the regulated community and wanted to gather input from that community. I mean, I think ATF would tell you that the rule makes clear that the rule improved significantly between the NPRM and the final rule. ATF had this proposed worksheet idea, got a lot of comments about how that was overly complicated, overly confusing, and ultimately decided to move away from it. And I don't think there's anything problematic about ATF before it tries to inform the public of how it understands the statute, just with the input from the public that's most affected. Can you think of another time when the government has put a proposed rule through notice and comment when it didn't have to? So I think the bump stocks rule is another ATF rule that, again, we think is an interpretative rule. And we have argued it's interpretative. I mean, so I think that's certainly one example. Bump stock rule is very problematic for you to rely on. I mean, considering Cargill, their statutory argument there is gun plus bump stock. ATF can't say to the world, that's a machine gun. It's very similar to here. Pistol plus brace that may be similar to a stock can't, according, just ATF can't law make and say that's an SBR. So to be, I think, very, very clear about this, the bump stock rule, we didn't have a finality argument. The bump stock rule, in our view, correctly classified bump stocks as machine guns under the statute. But we did think it was interpretative. This rule, we think, does not itself impose any obligations. It doesn't say all stabilizing braces make something into short-barreled rifles. It just says, here are the sorts of things that we're going to think about when applying the statutory standard, the standard of designed and intended to be fired from the shoulder that comes directly from the statute. But regardless, I think, of whether the Court thinks the rule is interpretative or not, the ATF went through notes and comment. There was no problem if it was doing a substantive rule or, sorry, a legislative rule. If the Court thinks it was doing a legislative rule, does it follow those procedures anyway? And I think, just to return to the statutory piece, which I think is probably the first place that the Court should start in thinking about the rule, if only as a matter of constitutional avoidance, before getting to the, I think, broader Second Amendment and other arguments, I don't really understand the plaintiffs to be directly taking issue with either of the two things that the rule does. I mean, the sort of primary or first move the rule makes to say that when thinking about whether something is designed and intended to be fired from the shoulder, ATF doesn't have to take the maker's sort of stated intent as dispositive, but instead can look to other design features, marketing materials, how the item is actually used as evidence to undermine or confirm the stated intent. I think that that's well established in the law. We cite the Sig Sauer case from the First Circuit. We cite a Seventh Circuit case. They're both in the context of the NFA. But it's true throughout the law. I mean, intent standards are throughout the criminal law, throughout the civil law, and I don't think anyone really thinks that if someone says, well, I intended X, you have to take that at face value, even in the face of contrary evidence that undermines that stated intent. Moving past the statutory claim to the APA, you were assuming it's substantive. If so, we are in the world of is the final rule a logical outgrowth, and you've heard their arguments that it's much more discretionary, and especially factors five and six weren't fully anticipated. So I don't think that's necessarily true, Your Honor. And let me say two things. One is just on the initial question whether it's a logical outgrowth, I point the court to the Huawei case, which I think lays out this framework very well. And here, the general approach, the approach of saying we're not going to just take a manufacturer's statements about intent as the only evidence or as the dispositive evidence, but instead look at the various additional design features and other evidence of intent is exactly what the NPRM did. And then each of the individual factors that the rule considers probative, or the rule thinks will be probative, come directly from the initial worksheet. I think the move that the rule made that sort of separated it a little bit from the NPRM is that rather than having sort of a hard points criteria that people found not to, I think, one, not to really reflect a true concept of intent, which is generally taking into account all the relevant evidence and making an ultimate factual determination about intent, and two, people just found it to be overly complex. And there were many, many comments about that that ATF heeded in changing the rule. And I think, so I think, number one, it just flows quite naturally from the rule, and there were a lot of comments about sort of how to think about the different factors in relation to each other and the complexity of the worksheet. And then second, even if the court has some concerns about that, I don't think petitioners or plaintiffs sort of dispute that they would have to show some prejudice from any lack of notice. And here, I think, in this context where there was notice, where there was an opportunity to comment, that would require them to demonstrate sort of some additional comments they might have made that ATF hadn't considered. And that's when we cite the DC Circuit case for that proposition, plaintiffs in their reply brief cite the Fifth Circuit case, United States v. Johnson, that I think is actually quite helpful on that proposition, and maybe we should have cited it in our brief, but that there rejected a logical outgrowth challenge on the prejudice prong on the basis that the sort of challenger in that case just hadn't identified any additional comments. And here, the complaints were suggested with made comments about vagueness or things like that, but the rule, ATF got many comments about particular factors and addressed all of those. In your brief, you're categorical that a, quote, true histo-brace would not qualify as a short-barreled rifle. That's because it'll always fail under the criteria or it doesn't even get to the criteria? So the ultimate question that the criteria are trying to answer is the thing designed and intended to be fired from the shoulder. And so a brace that is, if everyone agrees that the actual design and intent is that should instead be fired one-handed, used as a pistol brace, then it just would not be a short-barreled rifle under the statute. And there are some examples in the rule of particular designs that make that quite clear. Well, in fact, as one of the amicus briefs point out in some criminal prosecutions in 2019, ATF said, quote, ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA. So that, I mean, that's kind of a flat categorical statement that's broader than the way you just described it. No, Your Honor. I mean, I think the rule goes through in almost excruciating detail the history of classification letters. The ATF issued two devices that were labeled as stabilizing braces. Some of them, ATF said, would transform a pistol into a short-barreled rifle. It says a firearm with a pistol brace is not a rifle. That's what it says. I mean, are you now backing away from the accuracy of that 2019 statement? I don't think I'm quoting it out of context. I think it depends on what you mean by a stabilizing brace. An item that is, in fact, designed and intended not to be fired from the shoulder, but instead to be fired one-handed, would not transform something into a rifle. But you say in your brief on page seven, a true stabilizing brace is not. And my question is, how does an American know that who's got one that he or she thinks is a brace? Is it because of part one? Tell me where in the rule. I think it's part one, which says if it doesn't have, if it's got a protrusion or it doesn't have the surface area, we never get to any of the criteria. I think that would be the easiest way to know. It would be to design or procure one that is like the original stabilizing brace design, that is sort of soft and doesn't have the surface area to allow for shouldering. One, the rule talks about the hard protrusion on the back that would prevent shouldering or comfortable shouldering. I think those would be sort of the easiest steer as far away as possible from potentially having a short design or manufacture or obtain. I think if you don't want one of those, if you want something that starts to look more like a shoulder stock, but you don't think that it is in fact designed to intend to be fired from the shoulder, you could one, ask ATF for a classification, and ATF will tell you whether an ATF's judgment that the particular item or the particular braced weapon is in fact designed to intend to be fired from the shoulder. If you disagree with ATF on that, I would suggest that you could pay the tax, you could register the weapon, and you could bring a suit for a refund where you could challenge ATF's determination about whether the thing is or is not in fact designed to intend to be fired from the shoulder. Just on the statute, there would be no Chevron deference? There would be no Chevron deference. The job of the court in that suit would be to apply the statutory definition designed to intend to be fired from the shoulder, and ATF, of course, I think would point to some of the evidence. The ultimate criminal exposure for violation, is it 5871? There are, I think, different criminal provisions. That, I believe, is one of them. Prosecutions are brought? Prosecutions are brought for having unregistered short-barreled rifles, I mean, machine guns, there are a whole bunch of... Pretty big sort of Damocles over these three million Americans that have these already. So I think there's a couple things there. I mean, one is... This is the Texas sort of rug pull out argument, which is they never knew it was a mother may I regime. They had these things, they thought braces were exempt, the brief says they are exempt, and all of a sudden now they actually have felony criminal exposure, state and federal. And ATF has broadened it. That's sort of the Cargill problem, isn't it? No, I mean, ATF has not... Nothing ATF has done has changed the statute. I mean, the statute says that the statute says in a pre-enforcement civil challenge, if someone disagreed with ATF about the particular thing that they own, they could bring a pre-enforcement challenge, they could fight with ATF in court, the court would apply the statute. It's not a pre-enforcement challenge. Is this an as-applied, facial, what do you call this challenge? This case or the one that... This, to me, I think is a facial challenge to the rule, which... We don't know the individual plaintiff's guns. We don't have that in the record. Each of the individual plaintiffs says one particular braced weapon that they own. I can tell you one of the individual plaintiffs has the braced weapon that appears on page four of our brief, or something very similar to it, an SB-A3 brace with an AR-style pistol. Does it have a surface area, or is it just a strap? It looks exactly like a short-barreled rifle. I mean, it's one of the pictures we have. If you're on page four of our brief, there's two types. The brace that he says he has with an AR-style pistol, which he says he has it attached to. Then the other plaintiff, the other individual plaintiff, says he has one particular thing that he describes. I don't think we have pictures of that or additional information in the briefs or necessarily in the record about what exactly that looks like. But I think we would be perfectly happy to fight in an individual challenge, whether any particular one of these weapons is or is not a short-barreled rifle. But in this case, as I understand the plaintiff's argument, it's that the rule is spatially invalid because all, in their view, all braced weapons or all items labeled as stabilizing braces are categorically not short-barreled rifles. And that just, I don't think, can be squared with the text of the NFA or the way that we normally think about intent in any context. Let me take you to a point Mr. Jaffe made during his argument. Would you agree that adding a brace to a pistol makes it more stable, more accurate, more controllable, less concealable? Would you agree with all that? I think it depends, Your Honor. So, sort of a true stabilizing brace, one that we talked about maybe has straps on the back to wrap around, or one that has kind of the soft back that doesn't really work as a shoulder stock, but it actually is used to wrap around the forearm. I think that probably, for many people, makes sort of heavy, hard-to-control pistols easier to fire. So you would agree that a true stabilizing brace makes the pistol more stable, more accurate, more controllable? I think it depends, Your Honor. Do you disagree with that? So I think it depends a little bit, and I think there's two things here. So one is, I mean, since we're sort of veering toward the Second Amendment, I do want to be clear that I think just in terms of order of operations, the first thing for the Court to do is to figure out whether the rule comports with the statute. And so by the time we get to the Second Amendment, if the Court gets there, I think it will have already agreed with us that at least some of these items marked as stabilizing braces are, in fact, items that are designed to intend to be and constitute short-barreled rifles under the statute. And so starting from that premise, I think as the rule makes clear, for the last 90 years, Congress has regulated short-barreled rifles. Shortly after the NFA was passed, the Supreme Court in Miller upheld it against the constitutional challenge in the context of a short-barreled shotgun. Heller spent multiple paragraphs discussing Miller and reaffirming Miller and making clear that short-barreled rifles are not safe. And so all these dangerous weapons, machine guns and poison gas and all that, those we all understand are dangerous. But if these braces actually make it more accurate and more stable, is putting them into this 90-year tradition of regulation valid? So I think talking about braces as stocks, which again, I think is the question if we're talking about the Second Amendment, Congress has determined, and this is explained throughout the legislative history of the NFA as in sort of a bunch of court decisions that we cite, that the problem with a short-barreled rifle is that it makes sort of a pistol-like weapon, which is concealable, in many ways as accurate and dangerous as a rifle. And so, of course, in any sort of context, when thinking about whether a particular weapon is dangerous, in some ways you're going to think about who the person is that's firing it. And maybe if the person who's firing it is someone who is not trying to engage in criminal activity, then it's better for it to be more accurate. That I think would be true of any weapon under the NFA. But under Bruin, is there any history or tradition that would allow government to improvements to a weapon that would improve the weapon's capacity for safe operation? I mean, so I think that's sort of exactly what the NFA does with short-barreled rifles, and I think other short-barreled weapons as well, which again sort of combine that concealability of a pistol or a smaller weapon with the dangerousness of a longer weapon. And that sort of particular combination, Congress has determined is particularly dangerous. And that determination is reflected not just in the 90-year-old NFA, which the Supreme Court has twice upheld, and I'm aware of no circuit court that has suggested it would be unconstitutional. It's also reflected in, as we cite, 30 different states and the District of Columbia, all of which impose either outright bans on short-barreled rifles or prohibitions unless those rifles are possessed in compliance with the NFA's requirements. And so I think there's really just a legislative, across many, many, many legislatures for many, many, many decades, a determination that short-barreled rifles do have that particular and problematic combination of concealability and high power. If we reach the history and tradition analysis, set forth and brew it, how would you frame the question we have to answer? Is there a history and tradition of, now describe what you think the government's done and tell me where you see that history and tradition. Is there a history and tradition of, finish the sentence. So if we get to history and tradition analysis, I think we've gone past the dangerous and unusual piece. We've gone past the brewing footnote 9 piece. Well, I'm curious to hear footnote 9 later, but just if we're on the history and tradition. I think the question is whether there's a history and tradition of imposing sorts of registration, approval, taxation requirements. And we cite in our briefs, I think laws that go to each, some laws that go maybe to more than one of those, and to me, I think those laws provide a real history and tradition of inspecting firearms, which I think is in many ways akin both to the registration and approval of door-to-door surveys of firearms, which looks a lot like a registration requirement to me, of inspecting for dangerousness before permitting the... This is, as both your opposing counsel friends said, this is criteria limiting the classification of the gun, but nothing limiting ATF's discretion to just say, even if it is one, we're not going to let you have it. So I think that's kind of a different component of the NFA scheme that I don't think is an issue in this appeal. I mean, no plaintiff has said that they have applied for approval for any NFA weapon and been denied. And so if someone were to apply for approval and to be denied on a basis that they thought was irrational or arbitrary or not grounded in the statute, they could certainly bring an as-applied challenge, and they could bring an as-applied constitutional challenge to that, but that certainly hasn't happened to any plaintiff here. And so I think the plaintiffs here are really complaining about the requirements that they would have to comply with moving forward. I mean, the taxation and the pre-approval requirements have been waived for previous possessors so long as they... Is there room in the answer, primarily the history and tradition, half the colonies had these inspection things, or is it primarily footnote nine, and this is just a licensing registration scheme? Which, and do you have circuit level support for either? I know Bruin's recent. So it's both of those, which I think are separate arguments, and the dangerous unusual piece, which I think comes before... What is the unusual of three million American tansies? Let me say a few things about that, if that's where the court is hung up. I mean, number one is even three million, if that's the right number, falls well below the numbers that this court cited in Hollis as being indicative of common ownership. And I mean, the other piece is that in Hollis, at least, this court looked to the number of lawfully possessed weapons, of registered pre-1986 machine guns in that case, and here, I mean, the registration number is substantially less. The text at the naked scrape points to all these flintlocks that the framers had. They look awfully like a pistol with a stock attached. So I think that's sort of a different question maybe about whether the dangerous unusual inquiry thinks about sort of whether these specific weapons were regulated at the founding, or whether it thinks about whether the weapons are commonly used today. And I read Heller to make quite clear that the question is whether they are in common use today, or whether they are commonly used by law-abiding citizens for lawful purposes today. And Hollis really expands out that inquiry. Yeah, so that's your answer on dangerous and unusual. They qualify, they're unusual. If we don't accept that, and so we are looking for a 1791 analog, not a twin, analog, why aren't those flintlocks conclusive, especially attached to the district court's finding that the government here didn't yet show a contrary? So I think if you, well, first of all, I'll say, I'm not sure I read the district court's opinion that way. I mean, we gave these historical materials, the same ones we've given to this court, we gave them to the district court. The district court didn't sort of parse through them and say, I don't think any of these provide relevant support. The district court said, you know, I read him as saying with these materials that these maybe make out a prima facie case, and maybe it's not conclusive. The plaintiffs haven't come in and provided rebutting evidence. And so I think the district court is certainly open to reconsidering the constitutional question. And what about the flintlocks? And I don't think they are particularly relevant in this case. I mean, if you get past the dangerous and unusual piece, insofar as the sorts of requirements that we are talking about, the proofing requirements, the survey requirements, the inspection requirements applied to all guns. And so sure, flintlocks weren't banned in 1791. Short barreled rifles aren't banned today. They are just subject to these regulatory requirements that themselves have a substantial historical tradition. Isn't that a foot nine nine argument? We're really asking, is this just a licensing? It's not a ban. The government wants money and it wants to know who has them, but it's not going to say you can't bear them. I think there are two separate arguments. And I think a lot of times in the Second Amendment context, the text and the history sort of blur together because you're trying to interpret text as informed by history in some ways. But we would view those as two separate arguments. So one argument is, as we read Bruin footnote nine and as we read some of the statements in Heller, particularly related to commercial restrictions, it's that a particular regulatory regime or regulation just doesn't infringe the Second Amendment, doesn't allow individuals to bear arms in public for self-defense. And I think that sort of without even thinking about whether there are specific additional historical analogs, which of course the Supreme Court didn't go through sort of historical analogs for licensing or registration regimes or anything like that. In Bruin, the way it made clear that these sorts of regimes are permissible and are sort of the law in many, many, many states is that they just don't sort of meaningfully undermine the right in the same way that it's sort of a ban on someone who has firearms to lift those firearms would. Jumping back to the, sorry, to the regulatory definition, it strikes me as extremely broad in this sense. And maybe I missed this in the government's briefing, but did the government, did the Bureau identify or offer even one sort of pistol plus brace configuration that remains a pistol? Yes. So I would look to 6529 to 6530 of the rule, which explains that just sort of as a categorical matter, there are going to be certain designs that couldn't sort of feasibly be shouldered, designs that have a protrusion on the back that would prevent comfortable shouldering because of the recoil, designs that have just sort of elastic and straps rather than the surface area, designs maybe that have sort of squishy surface area that can't shoulder in the right way. And those would just categorically not be included. And then I think the hard, this is the hard problem the rule is trying to solve, is if you have a brace that like could be used as a brace, but could also be shouldered, then ATF has to figure out what the design and intent of the manufacturer is. And that's what all the criteria in the rule are trying to get at, is trying to parse through does it seem like the manufacturer in fact has designed and intended this weapon to be used from the shoulder. And so that's why ATF is looking at things like is it similar to things that the manufacturer is marketing as or that everyone agrees are in fact short barreled rifles. Does it have attachments? Does it have a sight that can only be used when you are shouldering the weapon? That is quite probative evidence that the weapon is in fact designed and intended to be shouldered. Does it, when you look at the marketing materials, is the manufacturer putting pictures in their pamphlets of people using the weapon from the shoulder? Again, I mean it's just sort of quite obviously probative intent of how the manufacturer intends the weapon to be used. And so those are things that ATF has just identified as probative. They're not dispositive. If the manufacturer came in and wanted a classification decision from ATF, or if there were some sort of enforcement proceeding, the manufacturer would be free to present whatever evidence they wanted that got at their intent. And ATF or court, depending on the particular circumstances, would have to determine just ultimately whether the weapon is in fact designed and intended to be fired from the shoulder. And then just circling back, Judge Higginson, to your last question about footnote 9, I think the other important feature of the NFA, when thinking about the extent to which it actually meaningfully undermines individuals' right to bear arms in public for self-defense, is that it applies to a very, very limited and discrete set of weapons. So even taking the 3 million number, which again we don't think is sort of the right way to think about this, but even taking that number, you're looking at maybe 1%, probably less, of the hundreds of millions of firearms in the United States. And even if you add in the other NFA-regulated weapons, machine guns and short-barreled shotguns and destructive devices, it's still a very, very small sliver of weapons. And so individuals can buy pistols. They can buy heavy pistols. They can buy rifles. One thing that jumps out to me is whereas the worksheet allowed an individual to really analyze kind of their own weapon and to sort of have an objective basis for disagreeing with the ATF's determination. But the final rule seems to vest the Bureau with kind of this complete unchecked discretion to use this subjective balancing test with half a dozen opaque factors on a scale that nobody can see. And so I think, Your Honor, that's just to be clear how intent-based inquiries work. I mean, every day in this country there are criminal trials that turn on a defendant's intent. And there's no points-based worksheet to try and you look at all the relevant evidence and a fact finder has to make a factual determination about intent. And so, I mean, that I think ATF is trying to capture that idea that the underlying question is this question that looks at a lot of different evidence that might be relevant. And it's trying to put the regulated public on notice of some of the evidence that ATF thinks is going to be particularly probative that may cut across a number of different weapons. And again, I mean, just to circle back to what I said earlier, to the extent that a particular individual is unsure about how ATF might classify his weapon, he is free to request a classification from ATF. He is free to register and pay the tax and then sue for a tax refund and sort of challenge that determination. So there are avenues for compliance for additional certainty that I think reduce any sort of vagueness questions or other sort of concerns about how this is applied. With Judge Smith's permission, a couple of questions. If in the end we conclude that Reed O'Connor did reversibly err in saying they weren't likely to concede either on the statutory or the constitutional relief, could you just talk a little bit about remedy? And I have three, I'll direct you in three directly. Would you suggest that at most we would remand for the district court to address balance of equity as irreparable harm and scope, one? And two, what argument, if any, do you have against the nationwide injunction here? Do we in the district court not have the authority to do it legally or would be inadvisable because other circuits are trying to consider it? So starting with the first point, I think oftentimes this court will remand to allow the district court to do the equitable balancing in the first instance. I don't think that's required by any procedural rule or other principles. This court looks at whatever it determines on the likelihood of success and has to get to the equities. It may be in a position to balance the equities, and we obviously have made the equitable arguments. We haven't told you that you should just remand it and let the district court deal with that in the first instance. But it certainly I think would be within the power of the court, particularly if you think the equitable questions or the scope questions turn on fact determinations or sort of discretionary determinations that a district court would normally make in the first instance, you would be perfectly free to remand and allow Judge O'Connor to make that determination in the first instance. On the nationwide scope piece, I think there's two things here. So one is we do believe that courts don't have power to enter nationwide injunctions that go beyond remedying the party's specific injuries. That's an Article III principle. It's sort of the Carlyle v. Sande principle is someone has to come into court with an injury, and the court has the power to redress that specific injury. And here, I think the plaintiff's injuries can be fully redressed by an injunction limited to the plaintiff. Maybe there's debate on the margins about sort of customers or household members that the court could work through or Judge O'Connor could work through and remand. But I don't think there's any cognizable argument that these specific plaintiffs, in order to have their injuries redressed, need an injunction to go to everyone in the country. And I think specifically when thinking about sort of the particular injury that plaintiffs have come in here that this court has Article III power to redress, we would carve out the Firearms Policy Coalition's members, as we explained, to have standing to assert claims on behalf of their members. They have to demonstrate that they are a bonafide membership organization, and they just haven't done any work to show what their membership structure is, whether the members control the organization. I'm not sure if they will get up here and tell you that they think their members will be bound by an inverse judgment. Last question, because Judge Smith's allowed you to go over, which is helpful to me. If we do impose a nationwide injunction, what does the ATF, presumably unregistered owners of short-barreled rifles, are still in violation of the statute? So what do you all revert to if we enter a nationwide injunction? That's a really good question that I'm not sure I have the answer to. I mean, as I said before, we think that this is just an interpretive rule that tells you what the best meaning of the statute is. The statute, if all that's enjoined is the rule, the statute is still there, and I think the courts and pre-existing, there's not sort of a pre-existing legislative rule, just rule revokes that we will go back to. It would just be a statute in the vacuum, and honestly, I don't know exactly how that will play out on the ground. This is somewhat repetitious, I guess, but does the Attorney General take the position that there can never be a nationwide injunction for anything, or there can only be a nationwide injunction under certain circumstances? I'm trying to understand what your position is. I thought you said maybe no nationwide injunctions anytime, anywhere. So our view is that principles of Article III constrain courts to remedying the specific injuries that produce the standing that allows a plaintiff to come into court. That's sort of the flip side of the standing part of Article III. It's not so much about, I don't know, the nature of the injunction. It's about remedying the plaintiff's injuries, and so in a case, and I think Feds for Medical Freedom, is a case like this where the district court found that a nationwide injunction was necessary to truly remedy the association's harms, and this court didn't disturb that factual finding in the district court, and so that would be one where, obviously, we disagreed on the specifics of that, but I think that would be the sort of circumstance where a nationwide injunction would be at least permitted as a matter of Article III. Of course, the question was about nationwide injunctions. I assume your answer is going to be the same either for a statewide injunction, which the state's attorney argued for, or there was mention of a circuit-wide injunction to avoid potential conflict with other courts in other circuits that may be considering this. I assume your answer is the same, but you can tell us. I think the answer is basically the same, although I would add that we do think there are substantial practical problems and problems that arise when one court sort of infringes on the ability of other courts to decide a legal issue that would be remedied. There are not Article III problems that would be remedied necessarily, but I think there are equitable problems that are remedied or narrowed by an injunction limited to the Texas or limited to the Fifth Circuit. So further then on the merits and aside from whether it's nationwide or otherwise, if we should happen to agree with the plaintiffs on, let's say, PAPA issues and decide that the rule does not comport with the statute or is not permissible under the statute, I know you don't like that assumption and it's hypothetical, but work with me on this. So then, would it be wise for us to maintain some kind of injunction on the appellate level or should we cede jurisdiction entirely to the district court so that we're finished with it and there's no continuing injunction of any kind from the circuit? Well, we're sort of dealing, you know, walking through the high weeds here, but tell me how this would play out. So I think we would prefer that you remand to the district court and let the district court decide rather than entering an injunction yourselves. But maintain the current injunction? Well, I think we would prefer that you vacate the current injunction and remand to the district court. We don't think there's some principle that prevents you. If you think that the equitable factors are clear, if you think that the scope questions are clear from exercising that power and entering injunction yourselves or remanding with instructions to enter an injunction, we don't think that would necessarily be advisable. And particularly to the extent that you think that there are sort of factual questions about, say, the coalition's associational standing or factual questions about how the equities would actually play out, that's something that obviously the district court is much better positioned to address in the first instance. And we would certainly welcome the opportunity to present arguments to the district court on those factual questions if this court thinks they are sort of hard to resolve or remain outstanding. You've handled a lot of questions and taken a lot of your time. Are there any other points that you wish to make? I'm not suggesting that you repeat anything you've already said. Is there anything else that you wanted to raise? No, I think that just about covers it. The court has no further questions. All right. Thank you, Mr. Jaffe. Mr. Jaffe, for rebuttal. Thank you. I will try to keep this punchy. The associational standing question is frivolous in the light of today's decision in the Harvard case where they talked about whether there was associational standing from a voluntary student group of students who objected to affirmative action. Are people actually joining? They pay to join to get a membership card. I mean, there's a declaration by Brandon Combs, the executive director. I don't even think it's in the ballpark of reason. So they're named. ATF would be able to know each person? Well, if we were forced to disclose our membership, but certainly each person who's a member could show a card and show a receipt that said, hi, I'm a member and prove their membership if they raised it, say, as a defense, which is happening, by the way, right now in Florida where a number of defendants are saying, hi, I'm a member. The injunction applies to me. Maybe helpful to me, start where he finished, which is if you prevail and we decide to join this, then presumably ATF is still going to be able to pursue unregistered owners of short-barreled statutes. Yes, we're just asking you to go back to the status quo ante. So whatever the guidance was before, whatever the things that these are fine, these are not fine, I think they can enforce those. Before January 31st? Yeah, well, before the final rule, correct. So the final rule, which is no longer repeal all of those guidance documents, it would no longer change the landscape. But yes, the prior landscape, if somebody literally had a stock and put a piece of tape on it and said, ha ha, it's now not a stock anymore. Yeah, they could go after that. We're not saying that. What we're saying is what I guess the difficulty with the nationwide injunction, then if I mean, obviously, the discourse, no one's done all this balancing your clients, then have less certainty as to what whether what they own is an illegal thing for them to own. And why wouldn't all the other people? It may be true that the plaintiffs here prefer that prior regime. But how why would we impose on many other Americans who want the clarity, want these criteria? Because most manufacturers and most people who buy from other manufacturers are buying things that there are letters about that say, yeah, this one's fine. And so it's not like there's just randomly people started to make pistol braces without getting letters. Manufacturers have too much at stake for that. So they got a letter saying this configuration is fine. This one's not. They sold those people, bought those. They bought them, assuming they were legal, because, of course, the manufacturers had letters. The Sig Sauer that one of my individual plaintiffs owns, the Sig Sauer pistol brace, that's subject to a letter. So there's perfect certainty. It may not be perfectly even handed. And they may have some cases that look like other cases that they treat differently. And that's a problem of ambiguity. If you want to know where ambiguity comes in, it's the fact that they can't get it straight under a 10 year regime. So the gun your plaintiff has that they prefer is the one on page four on the left. And that's one that there's a letter saying this is not this is a is that correct? I can't remember if it was the left or the right. There was one that it's the one they have on page four is the one that you just referred to that has a letter saying this isn't. Is that the picture on page four of the government's brief? It's not the one on page four. My client doesn't. Do you know whether anywhere in the record we can see the one that you say there's a letter? I'm assuming in other words, you see where I'm going. It may well be a device that stops at part one that categorically, absolutely undefined rule isn't. It may well be. But the question is, and remember, a lot of this rule goes well beyond what we've been discussing. It includes a combination of parts that could become a stock. So if I took a two by four and shoved it into what everyone agrees is a pistol brace, they think I've now made a short barrel rifle. And the fact that I own a two by four and a pistol brace means I constructively own a short barrel rifle, whether I ever put them together. This rule, that is the consequence of this ruled breath. It's an attack on buttstocks. No, it's an attack on pistol braces as a component of a constructive short barrel rifle. It would be equivalent to a buttstock, yes or no? If I shoved a two by four into it, it would be. The hypothetical you gave us saying, oh, this will now be encompassed. No one's disputing that they would be able to regulate that. I'm disputing that they can regulate it constructively. That's the Thompson center case effectively. It's almost identical to the Thompson center case. Yet they claim under this rule to be able to do that. And their constructive possession cases all claim to be able to do that. I want to point out, by the way, that I thought it was interesting in your conversation about the part one versus part two. Their position is, if it's capable of being shouldered, then we can make it a short barrel rifle. And that is exactly the position they deny taking, that it's not about capability. But oddly enough, it is. The only criteria that really matters is the first one. The mere possibility of shouldering means now everyone who has anything that even possibly could be shouldered has to worry that it's illegal. And you'll never know whether it will be or won't be, given the uncertainty of all those subsequent factors. And they oddly accuse us of making this argument when this is what he literally said, that part one is sort of the critical part, possibility of shouldering. Thank you very much. You're in legal peril, and you'll never know whether we're coming after you. That's a terrible regime. That's an awful regime, and it literally contradicts where you were capable of taking the kit they had and making a carbine, which is, by the way, a short rifle, right? And they even called it a carbine kit, oddly enough. So they marketed it as a carbine kit, yet the Supreme Court said that doesn't make it into constructive possession of a short barrel rifle. Anyway, I just wanted to point that out. It was an interesting conversation you had with him that I think illustrates the exact ambiguity and the exact problem of, once you get to point A, which is, is it possible, then possible suddenly becomes certain. The mere possibility means you're now a criminal. And that seems a little extreme, especially since they have letters, literally have letters. By the way, speaking of that, on the lenity question, the statutory ambiguity, I would just point to the University of the United States, which is a 2023 Supreme Court decision by Justice Gorsuch, pointing out that inconsistent prior decisions are evidence of ambiguity in the statute. The fact that they didn't quite know how to apply the statute, even if they say, oh, we're just following the words, but they had no idea how to apply the words. And so they themselves said they had inconsistent rulings. That proves the ambiguity, and it triggers the lenity. And that's more recent, obviously, a decision which I think should be under cargo, I think, that largely resolves the statutory construction case. Because my version of a clear statute is to say, if it's designed to be fired with one hand, even if it could be fired from the shoulder, you have to read that narrowly to say, no, no, no, that's not a legal thing. Because pistols designed to be fired by one hand are exempt, of course. And ATF understands these to be mutually exclusive categories. So you can't blur that line between them. That's what triggers the lenity. That's what triggers cargo. I think that's a, it's almost an admission when they say, we were getting it so confused and so wrong, which suggests that they had no idea how to read the statute. Well, if they had no idea how to read the statute, how in the world can an average citizen understand how to read the statute? A couple things, just housekeeping things. You had asked for a case earlier, I believe, which is on predictability. I would say Chocolate Manufacturers versus Block, which is footnote 24 of our opening brief, page 43. I would point out, interestingly enough, feds for medical freedom on the issue of a nationwide injunction, that's binding. We can debate about the constitutionality. They can decide that a bunch of precedent in the APA are unconstitutional by offering nationwide remedies. That's really not for this particular case. Maybe the Supreme Court will take that up one day. Maybe Justice Gorsuch will convince more of his colleagues to agree with him. I think he got it wrong in his analysis recently. I think there is the authority for nationwide injunction. I think there's plenty of standing. The fact that the remedy goes beyond just the individual plaintiffs, it's like a First Amendment case. You can use overbreath and ultimately all the people and the benefit of nursing them. If all we're going to do is say, well, you have to bring a class action now in order to get that relief, that seems like a bit of rearranging the deck chairs kind of problem. I would just say, go with your precedent. You can do this if you want. It's cleaner, it's easier, it's less confusing, and it doesn't force membership disclosure, which would be a nice thing, even though ultimately they would disclose it if they got sued. I would also say he says, oh, we're only taking a part of a few weapons. I would say that their own rulemaking says 99 percent of pencil braces would be banned. The notion that they can hypothetically come up with something that wouldn't be banned is curious. I would say if you look back at their previous rulings, many pencil braces were approved, and all of a sudden all of those are going to be revoked. It's not a trivial thing. Three million guns is not a trivial thing. And in Heller, of course, the availability of alternative weapons to defend yourself was not considered a defense to the challenge to handguns, right? They said, oh, you can always use a rifle, but why do you need a handgun? That was not an effective argument there, not an effective argument here. On the safety question, the fact that the NFA thinks short barrel weapons are bad, they don't think they're bad because they're dangerous. They think they're bad because criminals like them. But criminals like handguns, too. Just because criminals like something is not a reason why it's dangerous. I understand why a grenade is dangerous, because when you use a grenade to defend yourself, you kill lots of other random people without any specificity. When you use the exact same pistol that just happens to be braced a little more, I'm not changing the pistol. I'm just making it easier to aim and better to aim and hold. That can't possibly be dangerous. And their argument is that, well, Congress thought it was dangerous. I don't think you can impute that view to the little circular to say that I'm going to defend a law's constitutionality by agreeing that the law was right in the first place. No, I think you need to go back. We had short barrels, short stocks. We had elevated stocks. Historically, we did not view these as uniquely dangerous in the way we would view some exploding ordinance or something like that, that I could understand why you might think that was very dangerous. Just quickly checking to see if there's any housekeeping matters, and if not, if there are no other questions, I would say I submit the case. Thank you. Your case is under submission, and the court is in recess.